OPINION OF THE COURT
Bentley Kassal, J.
This case involves a novel issue in the field of foster care and, specifically, the rapidly expanding area of constitutional rights for the foster children and parents.
*127 ISSUE
The central issue in this article 78 proceeding is what rights do foster parents have to challenge the decision of a foster care agency (1) removing the foster children from their home or (2) failing to renew their certification as foster parents. More precisely, the issues are whether the court may review such determination and, if so, may the court direct recertification of the foster parents, restoration of the foster children and make an award of monetary damages.
FACTS
Petitioners, Marvin and Irvine Goldstein (Goldsteins), commenced this article 78 proceeding seeking judgment that they be recertified as foster parents and for other relief. The respondent, Director of the Jewish Child Care Association (JCCA), disputes some of the facts and is joined by the State Department of Social Services (State DSS) and the New York City Department of Social Services (City DSS) in vigorously disputing the legal conclusions to be drawn therefrom.
With regard to the facts, the State DSS held a hearing and made extensive findings of fact, all described at length hereinafter under "Fair Hearing”, which, in essence, concluded that JCCA acted erroneously and "abused its discretion in the matter”. Nevertheless, its legal position is that it has no jurisdiction to rectify the situation and that all jurisdiction lies with the local agency, the City DSS. Similarly the City DSS claims that JCCA is an independent contractor and that it is without authority to order JCCA to recertify the petitioners.
JCCA is an "authorized agency” (as defined by Social Services Law, § 371, subd 10, par [a]) with power pursuant to section 374 of the Social Services Law to enter into agreements with the City DSS to "place out and board out children”. In 1975, with two of their children away at college and their other two younger children no longer in need of close attention, the Goldsteins made application to JCCA to become foster parents. In March, 1975, after a full investigation, the Goldsteins were certified by JCCA as approved foster parents and, shortly thereafter, a young girl was placed in their foster care. She remained with them for seven months until she was able to return to her parents.
JCCA commended the Goldsteins for their foster care of this *128 first child and, one month later, JCCA asked them to take Dawn and Dennis, the infants in this proceeding. Although the Goldsteins originally had advised JCCA of their preference for only one foster child at a time, they, nevertheless, agreed and did take the two young children in order to avoid separating a brother and sister. This was on October 22, 1975, when Dawn was 17 months old and Dennis, 5 years old.
Dennis was emotionally disturbed with destructive tendencies, was receiving regular psychiatric care for hyperactivity and being treated with the psychotropic drugs, thorazine and ritalin. Dawn’s problems were that she refused to eat and was afraid to display her emotions. However, by March, 1977, both children had shown substantial improvement in foster care and were behaving almost like normal children. In fact, Dennis was doing extremely well in school and had made an excellent social adjustment with his peers.
Then the critical facts took place. On March 14, 1977, Mrs. Goldstein received an unannounced visit from a JCCA worker, who stated that the agency had been informed that Dennis had been tied to a bed, which Mrs. Goldstein denied. The following day, the same social worker informed Mrs. Goldstein that the children would be removed from their home on March 18. Mrs. Goldstein immediately requested and had a meeting with JCCA officials on March 17, where she denied doing anything wrong and asked the source of the report. JCCA did not respond but advised the Goldsteins that their certification as foster parents, which was about to expire, would not be renewed. On March 18, the children were removed from the Goldstein home.
FAIR HEARING
The Goldsteins immediately requested a fair hearing, pursuant to section 400 of the Social Services Law, to review JCCA’s removal of the children and its simultaneous refusal to recertify them as foster parents. This was held on June 27, 1977 before a State DSS hearing officer and, after a lengthy hearing, a decision was rendered, which, in turn, was adopted by the acting commissioner of the State DSS as the fair hearing report. The following findings of fact, inter alia, were made:
(1) Dennis’ psychiatric problems had improved while living with the Goldsteins and regular psychiatric care "was discon *129 tinued because Dennis had adjusted well to his new foster home”.
(2) In March, 1976, Dennis was taken to a hospital emergency room to check a bump on his head, received when his folding bed fell on him as he was climbing on it. The JCCA worker instructed the Goldsteins to discontinue use of the folding bed because she did not consider it safe. However, although the Goldsteins continued using the bed, JCCA took no further action.
(3) While the JCCA worker testified that JCCA had then decided that the Goldsteins were not properly following JCCA recommendations, there is no evidence that the Goldsteins were informed of this decision.
(4) “Dennis was doing well in school. He continued to improve in his school work and his first grade teacher attributed his exceptional progress in great part to the care and help given to him by [the Goldsteins]”. The school principal testified at the hearing that Dennis was "doing extremely well” in school, was in the top quarter of his class, had made an excellent social adjustment with his peers and he gave his unhesitating indorsement of the Goldsteins as foster parents.
(5) In March, 1977, the JCCA learned that someone at a community meeting had mentioned that a foster child named Dennis had been punished by being tied to his bed. At the hearing, JCCA admitted that it took no action to verify this story, it had no foundation in fact and stated that this story played no part in the determination to remove the children or not to recertify the Goldsteins.
(6) JCCA based its decision for removal of the children on the use of the folding bed, “clutter” in Dennis’ room and the failure of the Goldsteins to respond to recommendations or communicate with JCCA. However, the fair hearing report concludes that these conditions were so remote in time to the ultimate decision, they could not be a proper basis therefor. Further, the report finds that the progress made by Dennis was so great that “it is difficult to accept a contention of lack of care for the health and safety of the child”.
(7) JCCA violated section 450.10(a) of the Regulations of the State DSS (now 18 NYCRR 431.10) which requires at least 10 days’ written notice prior to the effective date of a proposed removal of a child from a foster family, except where the health or safety of the child required immediate removal. The report concludes "It is clear * * * that [JCCA] erred in *130 precipitously removing the children without notice as required by the Regulation and abused its discretion in the matter ” (Emphasis added.)
A reading of the 140-page transcript of the fair hearing clearly supports the factual findings and conclusions of the acting commissioner.
respondents’ position as to recertification
While counsel have addressed in detail and extensively briefed the issue of the removal of the children from the Goldstein home, minimal attention has been given to the issue of recertification of Goldsteins as foster parents. No evidence has been offered as to statutory, administrative or agency guidelines for initial certification or renewal of certification although I have found several regulations of the State DSS which would appear to apply. (See, generally, 18 NYCRR 441-445.) Essentially, it is the position of the respondents that certification must be renewed annually, pursuant to section 375 of the Social Services Law that it is solely within the discretion of JCCA as an authorized agency to decide whether to renew such certification and that the decision of JCCA is not reviewable.
catch 22
In spite of the decision by the acting commissioner that JCCA had abused its discretion and acted in an arbitrary manner, he did not direct the return of the children to the Goldsteins or provide for any other remedy. Rather, the decision concluded that:
"Unfortunately * * * [the Goldsteins] have no redress available through the fair hearing process. * * * [They] are not now certified as foster parents. Therefore, the children cannot be returned to them * * * Although, the actions and determination of the [JCCA] are not and cannot be affirmed, in view of the fact that the [Goldsteins] are not certified foster parents, the Commissioner of the State Department of Social Services is without jurisdiction to rule on the merits of the appeal.
"It should also be noted that the matter of the failure or refusal of [JCCA] to recertify the appellants as foster parents is not an issue that may be decided through the fair hearing process”.
*131 Even on this motion, it is the position of all of the respondents that the Goldsteins have no remedy — this in spite of the fact that the respondents include the only parties in charge of this problem, the executive director of JCCA, the Commissioner of the Department of Social Services of the State of New York and Assistant Commissioner of the City of New York Department of Social Services. Highlighting this irony is the third affirmative defense interposed by the respondent JCCA which states that the action between the Goldsteins and the JCCA is "moot * * * because the children are no longer in foster care”. The memorandum submitted by JCCA claims that "[r]ecertification is purely and simply at the discretion of the agency, which submits its recommendation to the State. The State then acts upon the recommendation. No authority exists for a hearing officer to upset such determination.”
The City DSS takes a similar position as evidenced by its answer:
"[T]he Goldstein home was licensed by * * * JCCA as a foster home pursuant to their authority under the Social Services Law and the 'Purchase of Child Care Services Contract’ * * * working as an independent contractor.
"[T]he Commissioner of Social Services is without authority to order a child care agency to license or recertify a particular foster home.”
Finally, the State DSS has submitted an answer stating:
"No administrative machinery exists to review the determination of [the Goldsteins’] status as foster parents by the [JCCA] * * *
"The power to certify a foster parent is solely that of an 'authorized agency’ such as the co-respondent. (Social Services Law, § 377.) The power of revocation of such certification belongs to both the agency and the state commissioner (Social Services Law, § 379). Petitioners have no statutory or administrative right to question the agency in its sole discretion of determining for the good of the children placed in its care who shall and shall not be a foster parent. It is a matter over which the State has no jurisdiction upon which to declare someone a foster parent and only concurrent jurisdiction in rescinding that status.”
DUE PROCESS
As the acting commissioner of the State DSS concluded in *132 the fair hearing report, JCCA’s decision to remove the children was arbitrary and capricious and in violation of State and city laws and regulations. Beyond this, the Goldsteins argue that the combination of actions by JCCA, the State DSS and the City DSS in directing or permitting the removal of the children and the denial of recertification as foster parents, violated their constitutional right to due process.
In opposition, the respondents contend that the Goldsteins have no due process rights with respect to removal of the children or recertification, relying principally on two cases: (1) Smith v Organization of Foster Families (431 US 816; hereafter Smith) and (2) Matter of Bennett v Jeffreys (40 NY2d 543; hereafter Bennett).
1. SMITH
As the respondents claim, the Supreme Court in Smith reversed a decision of a three-Judge constitutional District Court panel which ruled that this State’s procedures for removal of foster children violated the due process rights of the children and their foster parents. However, a careful reading of the Supreme Court decision indicates that it was decided on very narrow grounds and is not dispositive of the issues presented here.
First, that decision dealt with only the "liberty” element of the Fourteenth Amendment direction that "nor shall any State deprive any person of life, liberty or property without due process of law” in terms of the rights of the infant and foster parent unit thereunder. However, even as to that element, the court expressly declined to reach the "complex and novel questions” presented by the claim of protected liberty interests (Smith, supra, pp 842-847), in holding that such decision was unnecessary because "the procedures provided by New York State in § 392 and by New York City’s SSC Procedure No. 5 are adequate to protect whatever liberty interests appellees may have”. (Smith, supra, p 856.)
In a careful evaluation of the procedures, the majority opinion described in great detail the notice, conference, fair hearing and judicial review processes provided by sections 383, 392 and 400 of the Social Services Law and 18 NYCRR 450.10 (now 18 NYCRR 431.10) as well as the "even greater safeguards” including a "full trial-type hearing before the child is removed” (Smith, supra, p 831) afforded under the New York City regulations (SSC Procedure 5).
*133 However, none of those processes were made available to the Goldsteins to review the removal order or to challenge denial of recertification.
The other element of the due process test — the property interest — was not reached by the Supreme Court, since it was not renewed on the appeal. (Smith, supra, p 839.) Although that argument was rejected by the District Court (Organization of Foster Families v Dumpson, 418 F Supp 277, 280-281), that decision did not address all of the issues now presented, including the right of a foster parent to due process in reviewing the discontinuance of foster care payments. Were this issue alone presented here, this court might well conclude that the expectation of a foster parent to continue receiving such payments does rise to the level of a protected property interest subject to due process safeguards, especially where required to pay assumed continuing obligations in the maintenance of a home adequate to house the foster children. (Cf. Goldberg v Kelly, 397 US 254; Goss v Lopez, 419 US 565.) In the case at bar, two critical and complex constitutional interests — liberty and property are united and, as such, they clearly merit the protection of due process of law.
2. BENNETT
This important and far-reaching decision is cited by the respondents only for the statement in a footnote that the majority rejected any notion "that third-party custodians may acquire some sort of squatter’s rights in another’s child”. (Bennett, 40 NY2d 543, 552, n 2, supra.) However, that statement must be read in the context of the entire opinion which concludes that third-party custodians (e.g., foster parents) do have rights or an opportunity to be heard which is derived from the children’s rights to the protection of their best interests. Here, the Goldsteins who have exhibited their desire to protect the best interests of the children have expressly raised this issue as a further basis for this proceeding. I agree with their position.
Thus, contrary to respondents’ claims, the very cases cited to defeat the Goldsteins’ claims do actually buttress them.
CONCLUSION
The conclusion reached by all respondents, that there is no *134 remedy available to the Goldsteins, makes no sense either in law or logic.
In this case, the procedures available to protect the constitutional rights of the Goldsteins and their foster children were ignored. As the State DSS hearing officer concluded, JCCA violated the State DSS regulations. The JCCA also failed to afford them the greater procedural safeguards mandated by the City DSS Procedure No. 5 (Aug. 5, 1974), namely, a preremoval hearing and other provisions, which are discussed in the Smith case (supra, p 831).
Finally, as to the issue of the Goldsteins’ right to recertification, respondents contend they provided no procedure for review of that decision because no right of review exists. However, they further argue that the failure to recertify effectively mooted the issue of the improper removal of the children. Under these circumstances, the combination of the removal and failure to recertify did result in a deprivation of the. Goldsteins’ constitutionally protected rights without the protection of any safeguards such as those discussed in the Smith case (supra).
This State has recognized its obligation to act as parens patriae with respect to children in foster care and has adopted various provisions of the Social Services Law to carry out those obligations. While the system of delegating this responsibility to private organizations may have some beneficial effects, the State and city may not thereby absolve themselves of all responsibility for the actions of such private agencies. (Perez v Sugarman, 499 F2d 761, 766.)
No determination is being made regarding the power of the court to review a denial of certification in the first instance or the refusal to place children with certified foster parents. These issues are not before me and no views are expressed thereon. Nor is this decision intended to limit the rights of a governmental or authorized private agency to remove a child from foster care to place him in permanent adoption or to return him to his natural parents.
DECISION

(A) Recertiñcation

It is obvious that the State must adopt clearer guidelines for review of decisions to decertify foster parents and/or remove foster children. In this case, the fair hearing did provide a proper forum for such review. Accordingly, this court adopts *135 the conclusion of the acting commissioner of the State DSS, that the actions of JCCA were arbitrary and an abuse of discretion and, therefore, it is directed that the Goldsteins be recertified as foster parents.

(B) Return of Children

However, the issue of whether the foster children should be returned to the Goldsteins cannot be decided on the papers submitted. The passage of over two years since the original removal and the claim that their status as foster children has been changed warrant a hearing as to the best interests of the children at this time. (See, generally, Matter of Bennett v Jeffreys, supra.)
Accordingly, the matter of the placement of the children is remitted to the State DSS to conduct a hearing as to the best interests of the children. (While this court could direct such hearing to be held as part of this proceeding, remanding the same to the agency is more appropriate since it is charged with the responsibility for the welfare of foster children and, presumably, has expertise in this difficult area. See Matter of Bennett v Jeffreys, supra, p 552.)

(C) Monetary Damages

Finally, the present pleading, entitled, "re-notice of petition” also seeks "damages as a result of respondents’ illegal actions” and the memorandum in support of the motion discusses the propriety of such an award. Whether or not monetary damages should be available under the facts described above, there are no allegations supporting the same in the petition. As Mr. Justice Greenfield observed on a prior motion herein, "Insofar as petitioners appear to seek to recover what appears to be tort damages for what they term in their brief to be 'the negligent infliction of emotional distress, it appears that no such claim is even made in the petition.’ ” Further, the determination of such damages, if any, would be premature at this time in view of the above direction that the matter be remitted to the State DSS for further proceedings.
Accordingly, the request for such damages is denied without prejudice to commencement of a plenary action seeking the same within 60 days after the date of the determination by the State DSS as hereinabove directed.