**In the Interest of R.K.W.**

**No. WD 35885.**

Missouri Court of Appeals,
Western District.

Jan. 29, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
April 2, 1985.

Application to Transfer Denied
May 29, 1985.

Leonard K. Breon, Breon & Leffler, Warrensburg, for appellant.

Joseph P. Dandurand, Rahm, Rahm & Dandurand, P.C., Warrensburg, for respondent.

Before LOWENSTEIN, P.J., and NUGENT and BERREY, JJ.

LOWENSTEIN, Presiding Judge.

Following amendment in the notice, the parties on appeal of this child custody case are as follows: the minor child (R.K.W.) through Francis Marr (who had been legal custodian) is appellant, while respondents, the Pulliams, are the couple to whom the child was subsequently transferred and whom he has been with since March 23, 1984.[1] Rights of the natural parents were terminated in the midst of these custody shifts.

A brief overview is here in order. The child is now four (born April 13, 1981). Since age 4 months he had been with Mrs. Marr. In January 1984, transfer of custody was made from Marr to the Division of Family Services (DFS). In March 1984, transfer of custody was to the Pulliams. Prior to this appeal the Pulliams have never been in court, and for that matter, Marr was not in court until after the March transfer to the Pulliams.

Although the best interest of the child is the paramount question, unfortunately, as between the Marrs and the Pulliams, neither of which has been at fault, one family must end up broken hearted over this matter.

The following facts are taken from the legal file and the transcript of the hearing of March 28th which was requested by the Marrs to reconsider the March 14th change of custody order. In this opinion "JO" refers to the county juvenile officer and "GAL" refers to R.K.W.'s guardian ad litem.

April 1981—Child born.

August, 1981—Mother takes child to home of Francis Marr and her parents.

January 26, 1982—JO files petition to get custody since the mother left child at the house of Marr and her parents.

February 8, 1982—Francis Marr divorced.

March 2, 1982—Court order that in the best interest of child to be with Francis, under supervision of JO and DFS.

March 12, 1982—Terry Marr and Francis marry.

September 13, 1983—Court order continuing custody in accordance with previous order.

October 26, 1983—JO petition to terminate parental rights (child now age 2). Petition states custody with Francis Marr. Asked court "that legal custody of said child be transferred to Terry and Francis Marr for purpose of adoption."

January 6, 1984—DFS letter to court saying natural mother wants Marrs to adopt—home study to be made on Marrs.

January 10, 1984—Order stating Francis has had child since age 4 months. Natural parents terminated. Court transferred child to DFS to place with "foster family" for adoption. Court wants two more home studies submitted. (Hearing attended only by JO and GAL)—deputy JO told judge "prospective adoptive parents and child in lobby ... if the judge should need them."

January 24, 1984—DFS recommends Marrs for adoption, with some reservations, and notes the child regards Marrs as parents. Two other studies submitted for consideration.

January 27, 1984—Report on Marrs to the court. DFS had noted Francis had been reported on the hotline for neglect while babysitting. Reports were investigated and dismissed. DFS also stated Terry played in band on some nights.

March 14, 1984—Court order transferring child from Marr's foster placement to Pulliam for future adoption. No notice to Marr—she was not present. No hearing had been conducted.

March 16, 1984—DFS tells Marr's court has removed them.

March 23, 1984—Child taken to Pulliams.

March 27, 1984—Marrs file motion to restore custody to them and set aside order of March 14, 1984.

---

**1.** The spelling of the Marr's first name appears both as "Frances" and "Francis" throughout the case; Francis will be used in this opinion.

March 28, 1984—After hearing at which GAL present court reaffirms 3/14 order as in best interest of child.

April 23, 1984—This appeal is filed.

Letters and motions in the court file clearly indicate a longstanding interest by the Marrs to adopt. By the orders of January 10th and March 14th the Pulliams now are in custody prepatory to adoption.

The procedural history of this case is complicated by the court's apparent confusion as to Francis Marr's true status. The March 14 order refers to the child's "foster placement" when in fact the Marrs had never been licensed as a foster family.

The March 28th hearing basically allowed the Marrs to present evidence that it would be in the child's best interest to return his custody to them, and then allow them to proceed toward adoption. The natural mother, the grandfather and two other disinterested persons testified in favor of the Marrs. Francis Marr acknowledged she had received no public assistance for the child. She said DFS had never complained about her keeping the boy, and had asked her and her husband to become foster parents. She had told DFS they wanted to adopt and DFS had been supportive. She was not told of the March 14 hearing and had been led to believe by DFS their application for adoption had been sent in and was before the judge. On March 16 she was told the child was to be removed, and she later learned no petition for their adoption had ever been filed. Her husband Terry testified that he had been in contempt for non-payment of child support to his children, but that he had paid the $2700 due and now had regular employment as well as working part-time at night. At the time of the hearing they were living with his mother.

The DFS worker, Murray, had worked on this case for eight months. She said the court had requested three home studies which she filed in the latter part of January. She said there was a strong attachment between the child and the Marrs and the child considered them as "psychological parents and any change would be a real

disruption for him." She recommended that the Marrs be favorably considered as an "adoptive resource" for the child. The worker said it was now difficult for her to make a recommendation since the child was doing well in the new home. He had been in the new home since March 23rd. She had not seen him in the new home. She felt he would do fine in either place.

The court on March 28 told the Marrs that they had not been replaced because they had done something wrong but that the new home would be better. The court told the Marrs the two factors that had worked against them were the fact the natural mother knew their whereabouts and Terry's delinquent support of his children.

■ Where custody or a change arises within the context of dissolution, the criteria for determination are expressed in § 452.375 (Supp.1982). In § 452.380 temporary custody may be awarded after a hearing. Custody proceedings are to have priority, § 452.395. A court may order the deputy JO or welfare office to exercise continuing jurisdiction over the case, § 452.405. To effectuate a change the judge must act upon evidence adduced, and must conduct a hearing and act upon presentation of facts from which it may be determined whether a change would be in the best interests of the child. *Riley v. Riley*, 643 S.W.2d 298, 300 (Mo.App.1982). *See also* Section 452.410. As pointed out in *Leimer v. Leimer*, 670 S.W.2d 571, 573 (Mo.App.1984), a change of custody between the parents was set aside as not being supported by substantial evidence. Rule 73.01. The *Leimer* court noted the record was "nearly devoid of evidence that would bear on determining the children's best interests." *Id.* at 573 (footnote omitted). As a further caution the eastern district said it was unwise to transfer custody frequently and even at all unless a preponderance of the evidence so required. *Id.* at 574.

Also under the Uniform Custody Jurisdiction Act, § 452.440 *et seq.*, there are

provisions for persons having physical custody or custody rights to be given notice and to be made a party. Section 452.485.

■ If a change of custody following a marriage requires a hearing and reception of evidence, so too should there be such a requirement in a case like this one where custody under court order has been granted to a person. The best interest of the child can only be determined after receiving evidence. Here there was no hearing, no evidence, no record to support a change from Marr to DFS and ultimately to the Pulliams. Fundamental fairness would demand, if nothing else, notice and hearing to one under lawful custody with intent to adopt the child in their home. Also analogous to this situation is the Comment to Rule 120.01 dealing with appeals in juvenile detention matters, which says: "This rule is not intended to suggest that without a hearing the court may modify a judgment so as to impose additional restraints upon the juvenile or upon the custodian, or to deprive the custodian of custody, or to commit the juvenile to the division of youth services."

The Marrs did not have a "Foster Home" as described in § 210.481 et seq. No license was applied for by the Marrs or issued by DFS to operate a foster home under § 210.486. None of the previous orders here properly denominated the character of the placement as being in a foster home run by the Marrs. The foster care law requires a review of each placement every six months, §§ 210.710 and .730; a "dispositional hearing" eighteen months after initial placement, § 210.720. The time table in this case appears as if compliance with this law was being attempted. However, sections 210.760(3) and (4) require a minimum of five days notice (in writing and containing the reasons) to the foster parents before removing a child.

■ The January 10th order seemed to contemplate foster care placement by DFS after the award, but that was never done. Foster parents have physical custody but DFS has legal custody. *Matter of Trapp*, 593 S.W.2d 193, 204–05 (Mo. banc 1980).

At no time before or after January 10th was the custody of the Marrs under or in compliance with the foster care laws.

■ This case stands for the proposition that without a hearing and without a record, the judgment of the court which took custody from the Marrs cannot stand. *Cf., Matter of Williams*, 672 S.W.2d 394, 396 (Mo.App. banc 1984). The case of *Higgins v. Missouri Division of Family Services*, 580 S.W.2d 300 (Mo. banc 1979) (Seiler dissenting), is not factually close enough to this case to provide authority to affirm the trial court's actions. There the issue was whether a writ of habeas corpus was the remedy to block a transfer by DFS from the foster parents to another placement. The supreme court held since DFS had obtained temporary custody under court order and since it still had the child under the only order issued by the court, habeas was not available as a remedy to the dispossessed foster parents. In the case at bar custody originally in DFS was transferred to Marr. Rather than a transfer by the legal custodian DFS to another as in *Higgins*, here is involved an ex parte transfer from a longstanding and confirmed custodian to DFS and then to still others without benefit of notice or hearing. The only factual similarity here to *Higgins* is mentioned in the dissent which, while admitting the majority's disposition is "true, technically speaking," went on to say at page 302:

> The child has yet to have any hearing on what is in her best interests. The child was in the lawful custody of the Higgins family, placed there by the division. It is claimed (and we do not know it to be otherwise) that the Higgins family made known, early and on numerous occasions, their desire to adopt the child. They took care of the child for the first ten months of her life. There is an *offer* of substantial evidence in the file that the Higgins were good parents, that the child was thriving with them, and that it was detrimental to the child for her to be removed from the Higgins family.

There really is no claim by respondents to the contrary.

Yet with only scant notice and with no pretense of a hearing or consideration by any impartial arbiter as to whether to do so was in the best interests of the child, the child was removed from Mr. and Mrs. Higgins and transferred to a new family.

As stated earlier, Missouri does have a Foster Care Code, § 210.481 (Supp.1982), but nothing outlines the termination procedure of persons such as the Marrs. The legislature may very well wish to look at *Smith v. Organization of Foster Families for Equality and Reform (OFFER)*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). A foster family group attacked as unconstitutional the procedures in New York for the removal of children from foster homes in which they had resided a year or more.

The state required 10 days written notice of a proposed removal, and the foster parent could then request a conference with the Social Services Department to protest the removal. If the child was still removed, the foster parent could appeal to the state agency, with the resultant determination subject to judicial review. If the child had been in foster care for more than 18 months, the foster parent may obtain *preremoval* judicial review of an agency decision.

The Supreme Court declined to directly answer the difficult question of whether a foster parent has a constitutionally protected liberty interest; instead the court merely held that the New York procedures are adequate to protect *whatever liberty interest* a foster parent may have.

Federal courts in Georgia and Indiana have since applied the *Smith v. OFFER* case to their respective state procedures and found no protected liberty interest in the foster care situations considered. *Drummond v. Fulton County Department of Family & Children's Services*, 563 F.2d 1200 (5th Cir.1977); *Kyees v. County Department of Public Welfare of Tippecanoe County*, 600 F.2d 693 (7th Cir. 1979).

In *Goldstein v. Lavine*, 100 Misc.2d 126, 418 N.Y.S.2d 845 (Supp.Ct.1979), a New York court also applied *Smith v. OFFER* and found that "third-party custodians (e.g. foster parents) do have rights for an opportunity to be heard which is derived from the children's rights to the protection of their best interests." *Id.* at 851. There the state agency refused to verify the foster parents and granted no review of that decision, and then turned around and removed the children without any of the New York procedures, arguing that the failure to recertify effectively mooted the issue of improper removal of the children. This is anologous to the Marr's case but instead of being "decertified" as a foster parent, she had her status of legal custodian removed without notice or a hearing. The *Goldstein* court recertified the foster parents, noting that New York must adopt clearer guidelines for review of decisions to decertify foster parents and/or remove foster children. The issue of whether the foster children should be returned was remanded to the state agency since more than two years had passed since the original removal and this warranted a new hearing as to the best interests of the children.

The Pulliams contend Marr did not have standing to bring this appeal under § 211.-261 RSMo 1978. *See also* Rule 120.01. This statute allows an appeal to the child by a parent, guardian, legal custodian, spouse or next friend. The Pulliams reason since Marr lost custody on January 10, 1984 and didn't appeal from that order they can't do anything now. Under these circumstances this reasoning is devoid of merit. The January 10th hearing and order was done without the presence or knowledge of Marr. The March 14th order was accomplished *ex parte*. To deny standing to protest these orders which are being set aside would present a procedural "Catch 22" which this court will not allow. *Goldstein v. Lavine, supra*, at 849.

Although *Warman v. Warman*, 496 S.W.2d 286, 289 (Mo.App.1973) involved the father and grandparents on a motion to modify custody, the grandparents by virtue

of the decree became *in loco parentis* to the child. Any attempt to modify made them aggrieved parties able to appeal. This court noted in language applicable here:

> When such third parties have become custodians by virtue of such an order, then they are frequently placed in the position of defending the order on subsequent motions to modify filed by one or the other of the natural parents. (Citation omitted.) To assert that they have no right to litigate the future status of the child would render nugatory the order granting custody.

*Warman, supra,* at 289.

The Pulliams finally assert the appeal is untimely. Section 211.261 allows 30 days after entry of final judgment for an appeal to be lodged. The Marrs appealed the March 14th order, but filed a motion to restore custody which was finally ruled on March 28th. Since no trial was held on March 14th, the pleading of the Marr's could hardly be called a motion for new trial, but that is what it was for the purpose of filing an appeal. "The finality of a judgment in a juvenile case is postponed by the timely filing of a motion for new trial." *In Interest of R.L.P.,* 536 S.W.2d 41, 43 (Mo.App.1976). The March 14th judgment became final when the court ruled on Marr's motion on March 28th. Marr had 30 days after March 28th to file a notice of appeal. Her appeal filed April 23, 1984 was timely.

Another factor in this case that added to the confusion is the seeming acquiescence to the court's actions by the Division of Family Services and the guardian ad litem. The Marrs were led to believe everything was running smoothly in the adoption procedure when in fact the rug was being pulled out from under them. Common decency should have prompted DFS to tell the Marrs after January 10th that DFS had custody under court order. Without a placement then being made, the custody after January 10, 1984 by the Marrs was without court authority, leaving for exam-ple, their power to seek emergency medical care for the child completely negated.

At oral argument the guardian said that after much thought he decided it was in the child's best interest to be returned to the Marrs. But he never submitted a written brief, nor made any recommendation back in March when R.K.W. was first removed. As pointed out in *In Interest of J.L.H.,* 647 S.W.2d 852, 861 (Mo.App.1983), "it is imperative that the guardian ad litem investigate and have imput on the perspective of the child's best interest and this be presented to the *trial judge.*" (Emphasis added.)

Under the standard of review of Rule 73.01(c), and despite the presumption the trial court studied the matter carefully, *In Interest of J.L.H., supra,* there is just no evidence to support the court's orders transferring custody from the Marrs to DFS and then to the Pulliams. There is no evidence in any record to support a finding that either of those transfers was in the child's best interest. Therefore, the orders made in 1984 on January 10th, March 14th and March 28th are voided and the judgments are reversed outright as they pertain to custody. The judgment of January 10, 1984 is affirmed *only* as to termination of parental rights. Within 48 hours of the receipt of this opinion custody of R.K.W. is to be changed from the Pulliams to the Marrs with the aid and assistance of DFS. This result will return this case to the juvenile court in the status it was just following the October 26th petition asking for custody with both the Marrs for the purposes of adoption. Any ruling on this or any other petition relating to further custody or adoption is to result only from an evidentiary hearing after notice. Costs to be divided between the Marrs and Pulliams.

All concur.