IN THE MATTER OF: BABY BOY SCEARCE, DOB: 11/19/83

No. 8514DC755

(Filed 1 July 1986)

**1. Infants § 5— child custody—subject matter jurisdiction**

A petition filed by the DSS was sufficient to give the court subject matter jurisdiction in a child custody case where it was signed and verified by the DSS and alleged that the child had been placed with DSS by its mother, that the putative father was unknown, that North Carolina was the home state of the child and no other state had jurisdiction over the child, and that the best interests of the child would be served if the court assumed jurisdiction over him.

**2. Infants § 9— child custody—appointment of guardian ad litem for child**

The trial court did not err in appointing a guardian ad litem for a baby in a proceeding to determine custody of the baby. N.C.G.S. § 1A-1, Rule 17(b).

**3. Infants § 6.3; Rules of Civil Procedure § 24— child custody—intervention by foster parents**

The trial court did not abuse its discretion in allowing the foster parents to intervene in a child custody action where the court found that it was in the best interest of the child to allow such intervention. N.C.G.S. § 1A-1, Rule 24(b)(2).

**4. Infants § 6.3— child custody—award to foster parents**

The trial court had the authority to award the legal custody of a foster child to the foster parents.

**5. Infants § 6— child custody—order relieving DSS of further responsibility**

Where the trial court found that the best interest of a child who had been placed with the DSS by its mother would be served by awarding legal custody to his foster parents with limited visitation privileges to the child's father, and the court ordered the Durham Community Guidance Clinic for Children and Youth to monitor visitation and report to the court, the court did not err in ordering that the DSS have no further responsibility in the matter.

APPEAL by Petitioner Durham County Department of Social Services and Respondent Jeffrey Harmon from *Read, Judge.* Order entered 11 December 1984 in District Court, DURHAM County. Heard in the Court of Appeals 5 December 1985.

*Thomas Russell Odom for Department of Social Services, petitioner appellant; and M. Lynette Hartsell for Jeffrey Harmon, respondent appellant.*

*Carolyn McAllaster for Kelly and Barbara Whitman, intervenor appellees.*

*N. Joanne Foil, guardian ad litem, appellee.*

COZORT, Judge.

On 11 December 1984, the District Court of Durham County awarded legal custody of a 13-month-old baby boy to foster parents with whom the baby had been placed by the Durham County Division of Social Services (DSS) when the baby was two days old. DSS instituted this action in February of 1984 by filing a petition asking the court to take jurisdiction for the purposes of terminating the parental rights of the biological father, whose identity was then known only to the biological mother. The unwed 16-year-old biological mother had released the baby to DSS for adoptive placement when the baby was born. When the matter came on for hearing before the district court, DSS took the position that custody should be granted to the 18-year-old biological father who had since been identified, and, despite earlier statements and actions to the contrary, had subsequently requested custody of the baby. DSS appealed the district court's award of custody to the foster parents, alleging, *inter alia*, a lack of subject matter jurisdiction in the court, error in the trial court's appointing a guardian ad litem for the baby, and error in its allowing the foster parents to intervene. We affirm.

The facts presented below are taken from the detailed findings of fact entered by the district court in its Order of 31 December 1984, which took over 30 pages to reproduce in the record on appeal. No transcript of the evidence or narrative thereof was filed with this Court. Although the record on appeal contains many exceptions to the findings of fact made by the trial court, none of those have been argued in this Court as not being supported by clear, cogent and convincing evidence. Thus, we deem the facts as summarized below to be properly supported by the evidence and undisputed by the parties.

In early 1983, Dawn Scearce began dating a boy known to her as Jeffrey Brown. Dawn and Jeffrey attended junior high school in Rowan County. In the spring of 1983 Dawn became pregnant with Jeffrey's baby. When Dawn told Jeffrey she was pregnant, Jeffrey suggested she get an abortion which he would pay for. Jeffrey also informed Dawn that he could not marry her because he was planning to marry another woman by whom he had also fathered a child. Dawn attempted to get an abortion; how-

ever, her pregnancy had progressed past the first trimester, and she was unable to get an abortion.

During her pregnancy Dawn lived with her father and stepmother in Durham. Dawn and her parents approached the Durham County DSS in July of 1983 regarding the possibility of releasing the child for adoption. On 19 November 1983, Baby Boy Scearce was born in Durham County. On 21 November 1983, Dawn released Baby Boy Scearce to the Durham County DSS for adoptive placement. Prior to signing the release, Dawn expressed her concern to DSS officials that the biological father of the child or his parents should not be granted custody of Baby Boy Scearce because she did not feel that they were fit and proper individuals to have custody of the child. On 21 November 1983, Baby Boy Scearce was placed by DSS in the home of Barbara and Kelly Whitman, licensed foster parents.

On 17 February 1984, DSS instituted this action by filing a petition asking the district court to take jurisdiction over this matter for the purposes of terminating the parental rights of the then unknown father. On 17 February 1984, a guardian ad litem was appointed for Baby Boy Scearce. On 27 February 1984, Dawn appeared with her father and mother in district court and stated that she did not desire to divulge the identity of the biological father until she received the advice of counsel. On 26 March 1984, Dawn, through counsel, filed an affidavit in which she identified the child's father as "Jeff Brown." DSS officials soon learned that the boy known to Dawn as "Jeff Brown" was Jeffrey Eugene Harmon.

In early March 1984, Dawn returned to Rowan County, North Carolina, and attempted to locate Jeffrey. Dawn located Jeffrey, and he agreed to sign his consent for the release of the child to DSS. Several days later Marlene Gainey, Jeffrey's mother, informed Dawn that Jeffrey would not sign the consent to release the child for adoption because Mrs. Gainey and her husband wished to adopt the baby. Mrs. Gainey then contacted DSS and informed DSS that she was the paternal grandmother of Baby Boy Scearce and that she and her husband desired custody of the child.

On 1 May 1984, a motion in the cause was filed by Jeffrey Harmon asking the trial court to give exclusive care, custody and

control of Baby Boy Scearce to him. On 10 May 1984, the guardian ad litem filed a reply to Harmon's motion in the cause and filed a counterpetition and motion. The counterpetition alleged, among other things, that Baby Boy Scearce was a dependent, neglected, and abandoned child. The guardian ad litem asked the court to deny Harmon's motion in the cause requesting custody of Baby Boy Scearce.

On 28 March 1984, the foster parents of Baby Boy Scearce filed a motion to intervene. The DSS filed an answer to the motion opposing intervention by the foster parents. On 17 April 1984 the trial court allowed the foster parents to intervene; however, on 13 July 1984, the order allowing intervention was vacated because the biological father had not been served with the motion to intervene. On 19 July 1984, after the motion to intervene had been properly served on the father, the trial court allowed the foster parents to intervene pursuant to Rule 24(b) of the North Carolina Rules of Civil Procedure.

On 19 July 1984, DSS filed a petition asking the court to award legal and physical custody of Baby Boy Scearce to his biological father, Jeffrey Harmon. On 2 October 1984, the trial of this matter began and continued intermittently for two and one-half months. On 31 December 1984 the district court entered its 30-page order awarding legal custody of Baby Boy Scearce to the foster parents, subject to Jeffrey Harmon's rights of visitation. The court made 41 findings of fact (constituting 28 pages of the record on appeal), many of which were detailed findings concerning Jeffrey Harmon's history of emotional problems and his inability to adequately and consistently provide for the child's care and supervision. The court found that Jeffrey Harmon had a long history of disruptive and inappropriate behavior in school, including suspensions for fighting and using marijuana. Records from the Rowan County Mental Health Office showed he had been referred for counselling at the age of 12 when he tried to persuade two girls to have sex with him. Harmon was once adjudicated delinquent and placed on probation for vandalism. He was belligerent and hostile and had a problem with stealing. He used marijuana and "speed" on a regular basis. Jeffrey Harmon's biological father had "washed his hands" of Jeffrey because of his inappropriate behavior. Jeffrey had left his mother's home, the home of Tim and Marlene Gainey, because his stepfather, Tim

Gainey, had "beaten him to a pulp." He moved back into the Gainey home when his mother learned that Baby Boy Scearce was in the custody of Durham County DSS. Harmon has a sporadic employment history, having on at least two occasions quit full-time employment for no apparent reason. He had been fired from at least one other job and quit several other part-time jobs. Since the birth of Baby Boy Scearce, he has made sporadic support payments. He missed several scheduled visits with Baby Boy Scearce without explanation, testifying that it "caused him no concern that the child might be awakened early from his nap for a visit only to have him not appear."

The trial court further found that, at one point during Dawn's pregnancy, Jeffrey denied being the father of the baby. He offered no financial or other support during the pregnancy. Jeffrey knew the baby had been born by December of 1983, yet he made no effort to make contact with the child until after his mother called the Durham County DSS on 27 March 1984. The court found that Jeffrey was untruthful and that "he would say anything if he thought that particular statement would help convince the Court to grant him custody of Baby Boy Scearce." The court found that Jeffrey Harmon has "serious significant psychiatric problems and would not be able to adequately and consistently provide for the child's care and supervision." Harmon stated to a social worker that he did not feel that he could appropriately care for the child, and he planned to release the baby to Mr. and Mrs. Gainey so that they could adopt him.

The trial court also found that neither Jeffrey Harmon nor his mother Marlene Gainey knew where Baby Boy Scearce would sleep in the Gainey home if they were awarded custody. The Gainey home has three bedrooms, one occupied by Mr. and Mrs. Gainey, one by the two female children, and the third by three of the five male children. The two other boys slept in the small dining area of the home. Mrs. Gainey has been convicted of misdemeanor food stamp fraud and, at the time of the hearing, was under indictment for felony food stamp fraud. Mr. Gainey has been convicted of involuntary manslaughter for which he served a prison sentence.

The trial court found that Baby Boy Scearce has developed normally and is secure and happy in the Whitman home. The

Whitmans expected the baby to be placed out of their home by Christmas of 1983; however, when that did not happen, the Whitmans cared for and loved the baby such that "the bonding necessary for healthy, psychological development occurred." The court found that Baby Boy Scearce is "likely to develop various detrimental consequences of both a short term and long term nature if moved from the Whitmans at this stage of his development." The court found it would be in the child's best interest for custody to be placed with the Whitmans. The court found that Jeffrey Harmon could not provide proper care and supervision for the baby, that he had abandoned Baby Boy Scearce, and that he had "failed and refused to show any interest whatsoever in said child's health and welfare."

In its conclusions of law, the trial court concluded that neither Jeffrey nor Mr. and Mrs. Gainey were fit and proper individuals to have care, custody and control of the child. It concluded that the Whitmans were fit and proper and that it is in the best interest of the baby to award exclusive care, custody, and control of the baby to them. The court awarded legal custody to the Whitmans, with the rights of visitation to Jeffrey Harmon, ordered the Durham Community Guidance Clinic for Children and Youth to monitor visitation and to report to the court if necessary, and relieved the Durham County DSS of any further responsibility in the case. From this order the DSS and the father appealed. Pursuant to Rule 28(f) of the Rules of Appellate Procedure, the father joined in the brief of DSS. Thus, further references in this opinion to arguments by DSS are deemed to include the biological father, Jeffrey Harmon. Likewise, the intervenors and the guardian ad litem, appearing as appellees, have adopted portions of each other's briefs. Further references to the contentions of the guardian ad litem are thus deemed to include the intervenors.

DSS raises five issues on appeal: (1) whether the trial court had subject matter jurisdiction; (2) whether the trial court erred by appointing a guardian ad litem for Baby Boy Scearce; (3) whether the trial court erred by allowing the foster parents to intervene; (4) whether the trial court erred in awarding legal care, custody, and control of Baby Boy Scearce to the foster parents; and (5) whether the trial court erred by relieving DSS of any further responsibility in this case.

[1] DSS contends that the original petition it filed in this case was defective, and that the court, therefore, lacked subject matter jurisdiction over the entire matter. We disagree. The original petition filed in this matter was entitled "Petition for Order Acquiring Jurisdiction and Order Authorizing Service of Process by Publication." The petition set forth in the first paragraph allegations concerning the circumstances surrounding the release of the child to DSS. The third and fourth paragraphs alleged:

> 3. This state is the home state of the minor at the time of the commencement of this proceeding and has been his residence since birth. There is available in this state substantial evidence relative to the minor's present or future care, protection and training and personal relationships.

> 4. No other state would have jurisdiction to make a custodial determination as to the minor in accordance with G.S. 50A-3(a)(1)(2), or (3) and it is in the best interest of the minor that this court assumes jurisdiction over him.

The petition went on to request that the court enter an order acquiring jurisdiction over the minor thereby satisfying the jurisdictional requirements of G.S. 7A-289.23 in order that the petitioner could proceed with filing of an action to terminate any and all parental rights of the unknown father. The petition was signed and verified.

DSS contends that the petition was inadequate to confer subject matter jurisdiction on the court because it did not comply with the requirements of G.S. 7A-289.25, the actual petition for termination of parental rights. This argument is spurious. The petition was a preliminary petition asking the court to assume jurisdiction over the child, which the court did. The petition was not a petition to terminate parental rights. No petition to terminate the rights of the father was ever filed in this matter, and the father's parental rights have never been terminated.

DSS also contends under this assignment of error that the trial court lacked jurisdiction because the petition as filed failed to allege that the child was delinquent, undisciplined, abused, neglected, or dependent, in accordance with G.S. 7A-523, the part of the Juvenile Code dealing with "Jurisdiction." The contention of DSS is misplaced. The portion of Chapter 7A to which DSS re-

fers is within the part of the Chapter dealing with "juvenile offenders," "abused and neglected" children, the process by which those types of cases are brought into court, and appropriate dispositions made. The case below is a "custody" proceeding. In *Francis v. Department of Social Services*, 41 N.C. App. 444, 255 S.E. 2d 263 (1979), we discussed what was necessary to confer jurisdiction in custody cases:

> This is a civil action for custody of a minor child. The child was physically present in this State and the court obtained personal jurisdiction over the defendant agency, which had actual control and custody of the child when this action was commenced. Either of these factors would vest jurisdiction in the courts of this State to determine custody of the child. *See* G.S. 50-13.5(c)(2). "The district court division is the proper division . . . for the trial of civil actions and proceedings for . . . child custody." G.S. 7A-244. The procedure in actions for custody or support of minor children is prescribed in G.S. 50-13.5. Subsection (h) of that statute provides that "[w]hen a district court having jurisdiction of the matter shall have been established, actions or proceedings for custody and support of minor children shall be heard without a jury by the judge of such district court and may be heard at any time." We hold that by virtue of these statutes the district court had jurisdiction over the subject matter of this action.

*Id.* at 448, 255 S.E. 2d at 265-66.

The case below is controlled by our ruling in *Francis*. This petition alleged that the child had been placed with DSS by its mother; that the putative father was unknown; that North Carolina was the home state of the child and no other state had jurisdiction over the child; that the best interest of the child would be served if the court assumed jurisdiction over him. The petition was signed and verified by the DSS.

We also note that after DSS's petition was filed, subsequent petitions filed by the guardian ad litem and the father properly brought the question of the child's placement and custody before the court. The counterpetition of the guardian ad litem alleged that the child was dependent, neglected, and abandoned. The father's motion in the cause raised the issue of custody. Once juris-

diction of the court attaches to a child custody matter, it exists for all time until the cause is fully and completely determined. *In re Shue*, 311 N.C. 586, 319 S.E. 2d 567 (1984); *Latham v. Latham*, 74 N.C. App. 722, 329 S.E. 2d 721 (1985).

[2] Next, DSS contends that the trial court erred in appointing a guardian ad litem for Baby Boy Scearce. The trial court appointed the guardian ad litem after the original petition was filed and prior to the first hearing in this case. In the Order appointing the guardian ad litem the district court relied on G.S. 7A-586, which provides that, "[w]hen in a petition a juvenile is alleged to be abused or neglected, the judge shall appoint a guardian ad litem to represent the juvenile."

DSS argues that the appointment was invalid because (1) the court did not have jurisdiction over the matter, and (2) the original petition contained no allegations of abuse or neglect. As to the first argument, we have held that the court had jurisdiction over the subject matter after the filing of the original petition. While we agree that the original petition contained no allegations of abuse and neglect, we do not read G.S. 7A-586 to prevent the application of other pertinent statutory provisions. *See In re Clark*, 303 N.C. 592, 281 S.E. 2d 47 (1981). Whether the appointment of a guardian ad litem for the minor child is necessary in a proceeding is controlled by G.S. 1A-1, Rule 17(b), N.C. Rules Civ. Proc. "[U]nder the statutory law and traditional practice of this State, the minor parties to a civil action or a special proceeding must be represented by a guardian ad litem . . . ." *Clark, supra*, at 598, 281 S.E. 2d at 52; *Sadler v. Purser*, 12 N.C. App. 206, 209-10, 182 S.E. 2d 850, 852 (1971). " 'The appointment of the guardian *ad litem* is to protect the interest of the infant defendant at every stage of the proceeding.' (Citation omitted.)" *Clark, supra*, at 598, 281 S.E. 2d at 52. Thus, we hold that the trial court did not err by appointing a guardian ad litem for Baby Boy Scearce in this proceeding.

[3] DSS next contends that the trial court erred when it allowed the foster parents to intervene in this action. We disagree. The trial court allowed the foster parents to intervene pursuant to Rule 24(b) of the North Carolina Rules of Civil Procedure. Intervention pursuant to Rule 24(b) is permissive and within the discretion of the trial court. *Ellis v. Ellis*, 38 N.C. App. 81, 247

S.E. 2d 274 (1978). In its order allowing intervention by the foster parents, the trial court made the following finding of fact: "The participation of the movants, who have been Baby Boy Scearce's exclusive caretakers to date, as parties to this action will enhance the Court's knowledge and judgment as to the issues before this Court, including the best interests of Baby Boy Scearce." The trial court concluded: "[I]ntervention by movants will not unduly delay or prejudice the adjudication of the rights of the original parties."

Our research reveals no North Carolina cases directly on point. Under G.S. 7A-667, this Court held that foster parents were custodians as defined by G.S. 7A-278(7) (repealed in 1979), and, therefore, had the right to notice, the right to intervene and to present evidence, and the right to contest orders of the court. *In re Kowalzek*, 32 N.C. App. 718, 721, 233 S.E. 2d 655, 657 (1977). However, G.S. 7A-517(11), the replacement for G.S. 7A-278(7), currently defines Custodian as "[t]he person or agency that has been awarded legal custody of a juvenile by the court." This definition is much narrower than the previous definition, and *In re Kowalzek* is not applicable.

DSS argues that *Oxendine v. Department of Social Services*, 303 N.C. 699, 281 S.E. 2d 370 (1981), controls here and that intervention by foster parents is not permissible. We disagree. In *Oxendine*, the foster parents filed a complaint in district court pursuant to G.S. 50-13.4 and G.S. 50-13.5(b)(1) seeking permanent custody of their foster child. The North Carolina Supreme Court found that, because the natural parents of the foster child had voluntarily released their parental rights and surrendered the child to DSS for adoptive placement pursuant to G.S. 48-9(a)(1), the provisions in G.S. 48-9.1(1) governed the action. *Id.* at 706, 281 S.E. 2d at 375. The court held that nothing in the language of G.S. 48-9.1(1) gave the foster parents standing to contest the department's or agency's exercise of its rights as legal custodian; therefore, the foster parents were without standing to *bring an action* seeking custody of the minor child placed in their home by defendant. *Id.* at 707, 281 S.E. 2d at 375.

*Oxendine* is distinguishable from this case. Because both of Baby Boy Scearce's biological parents have not released him to DSS for adoptive placement, this case is not controlled solely by

G.S. 48-9, *et seq*. In addition, this case involves permissive intervention, not standing to bring an action. Standing is a requirement that the plaintiff have been injured or threatened by injury or have a statutory right to institute an action. *See* G.S. 1-57; *Sanitary District v. Lenoir*, 249 N.C. 96, 99, 105 S.E. 2d 411, 413 (1958). An intervenor by permission need not show a direct personal or pecuniary interest in the subject of the litigation. Shuford, *N.C. Civil Practice and Procedure*, Sec. 24-7, p. 201. It is in the court's discretion whether to allow permissive intervention pursuant to Rule 24(b)(2); and, absent a showing of abuse, the court's decision will not be overturned. *Ellis v. Ellis, supra.*

G.S. 7A-659 recognizes the right of the foster parents to participate in review proceedings concerning the placement and care of the foster child after termination of parental rights. The statute requires that notice of review be given to the foster parents and requires the foster parents to attend the review proceedings. At the very least, foster parents have the right for an opportunity to be heard, a right which derives from the child's right to have his or her best interests protected. *See Smith v. Organization of Foster Families*, 431 U.S. 816, 841-42 n. 44, 53 L.Ed. 2d 14, 33 n. 44, 97 S.Ct. 2094, 2108 n. 44 (1977); *Goldstein v. Lavine*, 100 Misc. 2d 126, 418 N.Y.S. 2d 845 (1979). The right of foster parents to intervene by permission was recognized by the Court of Appeals of Missouri in *In re K.L.G.*, 639 S.W. 2d 619 (1982). The Court reasoned that intervention was necessary to elicit full and accurate information pertaining to the welfare of the child. *Id.* at 622; *see also* 621-22 n. 1. DSS and the father argue that the father was prejudiced by the trial court's allowing the foster parents to intervene. While it may be true that the foster parents did not advocate the position of the father or DSS, the trial court found, and we agree, that intervention by the foster parents would not "prejudice the adjudication of the rights of the original parties." The court further found that the best interests of the child would be served by allowing the foster parents to intervene. DSS has failed to show any abuse of discretion by the court. We hold the trial court did not err by allowing the foster parents to intervene in this action where the trial court found it was in the best interests of the child to allow the intervention.

[4] Next, we consider the argument of DSS that the trial court erred by awarding legal care, custody, and control of the minor

child to the foster parents. DSS argues that *Oxendine, supra,* prohibits the transfer of legal care, custody and control of the foster child to the foster parents. We do not read *Oxendine* to prohibit such a result. *Oxendine* stands for the proposition that foster parents have no standing to bring a custody action pursuant to G.S. 50-13.2, *et seq.* Our case is similar to *Francis v. Department of Social Services, supra,* where this Court stated:

> All that had happened here prior to the institution of the present custody action is that the mother had surrendered the child to the defendant Department and had signed a general consent for his adoption. The effect of this was to give legal custody of the child to the Department "unless otherwise ordered by a court of competent jurisdiction." G.S. 48-9.1(1). Here, a court of competent jurisdiction has otherwise ordered.

41 N.C. App. at 449, 255 S.E. 2d at 266. Having acquired subject matter jurisdiction, the court, guided by the best interests of the child, had broad dispositional powers, including the power to award legal custody of the child to the foster parents. *See* G.S. 7A-647(2)(b), G.S. 50A-1, *et seq.*; and G.S. 50-13.2. This assignment of error is overruled.

[5] In the final assignment of error DSS contends that the trial court erred by ordering that DSS have no further responsibility in this matter. We disagree. The trial court found, after numerous days of testimony, that the best interest of Baby Boy Scearce would be served by awarding legal custody to his foster parents with limited visitation privileges to the child's father. The father's visitations with the child are to be monitored by the Durham Community Guidance Clinic for Children and Youth in Durham and the Guidance Clinic is to report to the trial court concerning the visitations. The trial court has not terminated *its* jurisdiction over the child, nor have the responsibilities of the guardian ad litem been terminated by the court. The participation of DSS in this matter is not statutorily required or as a practical matter necessary. We hold that the trial court did not err in relieving DSS of any further responsibility in this matter.

We recognize that child custody disputes are sensitive and emotion-laden subjects which stir strong conflicts among the litigants. We are not unsympathetic to all those involved in this mat-

ter. However, after reviewing the record, we are convinced that the trial court's rulings and orders are legal, correct, and in the best interest of the child. The record before us is completely devoid of any basis, legal or factual, to support the position advocated by the Department of Social Services, which was to place the child with his biological father. Thus, the orders of the trial court are

Affirmed.

Judge WEBB concurs.

Judge BECTON concurs in the result.